UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RAYMOND BONNER,

                                          Plaintiff,

                    -v-

FEDERAL BUREAU OF INVESTIGATION *and*
CENTRAL INTELLIGENCE AGENCY,

                                          Defendants.

---

21 Civ. 2166 (PAE)

<u>OPINION & ORDER</u>

PAUL A. ENGELMAYER, District Judge:

This lawsuit under the Freedom of Information Act ("FOIA") arises from a request by plaintiff Raymond Bonner ("Bonner"), a journalist, for records held by federal agencies related to the detention of Abu Zubaydah ("Zubaydah"). Zubaydah is a Palestinian citizen detained in the wake of the September 11, 2001 terrorist attacks and held by the United States in the Guantanamo Bay detention camp in Cuba. Bonner brought this action against the Central Intelligence Agency ("CIA") and the Federal Bureau of Investigation ("FBI," and collectively with the CIA, the "Government" or the "agencies"), seeking disclosure of documents relating to Zubaydah's interrogation and detention.

During this litigation, the parties have significantly narrowed the areas in dispute. Two remain. Bonner challenges the Government's withholdings within two sets of documents jointly controlled by the agencies: (1) a handwritten notebook prepared by former FBI agent Ali Soufan ("Soufan"); and (2) typewritten summaries of interactions with Zubaydah prepared by Soufan and former FBI agent Stephen Gaudin ("Gaudin").

Pending now are cross-motions for summary judgment on these issues. For the reasons that follow, the Court grants the Government's motion and denies Bonner's cross-motion.

## I.     Background

### A.     Factual Background[1]

On March 28, 2002, American and Pakistani forces captured Zubaydah and others in a series of raids in Faisalabad, Pakistan. Dkt. 49 ("Scott-Clark Decl.") ¶ 52. By March 31, 2002, Zubaydah was being held in a CIA-controlled detention facility in Thailand. *Id.* ¶ 54. FBI agents Soufan and Gaudin then interrogated him over a period of at least 10 days. *Id.* ¶¶ 54, 57; *see id.* ¶ 58. According to Bonner, the CIA then took over the interrogation. *Id.* ¶¶ 57, 62. Starting on August 4, 2002, the CIA tortured Zubaydah "almost 24 hours a day for over two weeks." *Id.* ¶ 65. This torture sought to extract information about future attacks on the United States. *Id.* ¶ 60. Bonner claims that the CIA subjected Zubaydah to at least 83 sessions of waterboarding and used other techniques such as sleep deprivation, stress positions, and mock burials. *Id.* ¶¶ 61, 65. In connection with the interrogation, Soufan and Gaudin created the contemporaneous notes and summaries at issue in this litigation. *See* Dkt. 48 ("Pl. Mem.") at 12; Dkt. 45 ("Defs. Mem.") at 7.

Zubaydah's capture, treatment, and subsequent confinement have been the subject of numerous investigations and reports. *See* Scott-Clark Decl. ¶ 69. These include congressional hearings and published reports by, among others, the CIA Inspector General's Office, the Senate Select Committee on Intelligence, and the European Court of Human Rights. *See id.* Reporters and researchers have written on Zubaydah in books and news reports. *See id.* ¶¶ 18, 70. United States military and intelligence officials, including Soufan, have also written about Zubaydah in books. *See id.*

---

[1] This summary is based on the Complaint, the parties' briefing, and supporting declarations. It is intended to supply context for the FOIA issues at hand. It is not intended as factfinding.

Zubaydah is currently detained at the U.S. military base at Guantanamo Bay, Cuba.  Dkt. 1 ("Compl.") ¶ 12; *see also* Dkt. 9 (refiled).

**B.    Procedural History**

On December 4, 2020, Bonner submitted a FOIA request to the FBI seeking "[a]ll notes prepared by FBI Agent Ali Soufan, in whatever form and wherever located, that concern the interrogation or treatment of Zubaydah at any point after March 28, 2002."  Compl. ¶ 22; *see id.,* Ex. A (copy of December 4, 2020 FOIA request to FBI).  On January 30, 2021, Bonner submitted FOIA requests to the CIA and FBI seeking (a) all records created between March 30 and July 15, 2002 authored by Soufan, and (b) all records created between March 30 and July 15, 2002 which refer or pertain to Zubaydah.  *See id.,* Exs. E (copy of January 30, 2021 FOIA request to FBI),[2] F (copy of January 30, 2021 FOIA request to CIA); Dkt. 43 ("Blaine Decl.") ¶ 7; Dkt. 50 ("Schulz Decl.") ¶ 2.  Both requests sought expedited review to enable the information yielded to be available in time for Bonner's anticipated documentary, which he intended to release on the 20th anniversary of the September 11 attacks "when public attention and debate will be uniquely focused on the continuing issues raised by our nation's response to them."  Compl. ¶ 23; *see id.* ¶ 5.

On March 12, 2021, Bonner commenced this action, seeking orders directing compliance with his three FOIA requests.  The CIA had denied Bonner's request for expedited processing, and the FBI had denied his request for expedited processing of the December 4, 2020 request,

---

[2] In its answer, the FBI denied that it ever received the January 30, 2021 request.  Dkt. 13 ("Answer") ¶ 5.  The parties later determined that Bonner drafted an electronic FOIA request to the FBI, but did not properly execute its submission via the agency's FOIA portal.  Dkt. 16 at 1 n.1.  This filing error has not had any bearing on the resolution of the parties' cross-motions.

and not responded to his request for expedited processing of the January 30, 2021 request. *Id.*
¶¶ 25–27, 32, 42. On April 19, 2021, defendants answered. Dkt. 13.

Early in this litigation, "the parties . . . met and conferred extensively concerning the
scope of Bonner's FOIA requests" and the timing of the agencies' searches for and processing of
responsive records. Dkt. 16 at 2. In April 2021, Bonner narrowed his requests to documents
"concerning the interrogation or treatment of Abu Zubaydah that were communicated between
March 28, 2002 and the end of June 2002, to or from the CIA site where FBI Agent Ali Soufan
was located for much of that period." Schulz Decl. ¶ 3. In response, the FBI disclosed that it
had located a handwritten notebook kept by Soufan during that period, with entries in English
and Arabic, and a collection of typewritten daily summaries authored by Soufan and/or Gaudin.
*See id.* ¶ 4; Dkt. 16 at 2; Dkt. 58 ("Normand Decl.") ¶¶ 6, 9 & n.3.

In May 2021, Bonner further narrowed his requests in exchange for expedited processing
of a particular record he had identified as a priority. Schulz Decl. ¶ 5. The agencies agreed to
process, on an expedited basis, the English-language portions of Soufan's handwritten notes. *See*
Normand Decl. ¶ 9; Schulz Decl. ¶ 5. In exchange, Bonner agreed to forego (1) receipt of any of
the Arabic language portions of the notebook and (2) production of certain CIA cables identified
as responsive. *See* Normand Decl. ¶ 9; Schulz Decl. ¶ 5. Bonner also agreed to defer the
processing of his request for the typewritten summaries until after the handwritten notes had
been produced. *See* Normand Decl. ¶ 9 & n.3; Schulz Decl. ¶ 5.

On July 7, 2021, the FBI produced 93 pages of Agent Soufan's handwritten notes with
redactions. *See* Dkt. 44 ("Seidel Decl.") ¶ 13; Schulz Decl. ¶ 6; *see id.*, Ex. 1 (copy of July 7,
2021 production). On July 9, 2021, Bonner's counsel, by email to the CIA, objected to "the
unjustified redactions" "given the many public reports about the interrogation and its results,

including in a book by Agent Soufan himself." Schulz Decl. ¶ 7; *see* Normand Decl. ¶ 11. That day, the CIA responded that it would review Bonner's points. Schulz Decl. ¶ 7; *see id.*, Ex. 2 (July 9, 2021 emails). On July 31, 2021, the CIA informed Bonner's counsel that it would submit portions of the notebook to an Information Review Officer with original classification authority and background in detainee issues to determine whether any information should be considered for declassification. Normand Decl. ¶ 11; Schulz Decl. ¶ 8; *see* Blaine Decl. ¶ 17.

On October 6, 2021, as a result of the CIA's declassification review, the FBI reproduced eight pages of the handwritten notes, each with some redactions removed. *See* Normand Decl. ¶ 13; Schulz Decl. ¶ 10. On November 19, 2021, the FBI produced 71 pages of the typewritten daily summaries with redactions. *See* Seidel Decl. ¶ 16; Schulz Decl. ¶ 12. Bonner again objected, asserting that the redacted information had been publicly disclosed elsewhere. *See* Normand Decl. ¶ 15; Schulz Decl. ¶¶ 13–15. On July 7, 2022, after undertaking another declassification process, the FBI reproduced 25 pages of the typewritten summaries with some redactions removed. *See* Normand Decl. ¶¶ 16–17; Blaine Decl. ¶¶ 22–23; Schulz Decl. ¶ 16.

On September 15, 2022, Bonner informed defendants that he continued to object to all the remaining redactions other than (1) the names of undercover government agents who have not publicly revealed their identities and (2) the CIA's black site locations. *See* Normand Decl. ¶ 18; Schulz Decl. ¶ 19. On September 22, 2022, the parties notified the Court, by letter, that they intended to move for summary judgment. Dkt. 37.

On December 22, 2022, defendants moved for summary judgment. *See* Dkts. 41–45. In support, defendants publicly filed several declarations. These are from: (1) Assistant United States Attorney Sarah Normand, representing the CIA and FBI and setting out the procedural history of this litigation, including the parties' negotiations and defendants' productions of

documents, *see* Normand Decl.; (2) Vanna Blaine ("Blaine"), an Information Review Officer at the CIA, detailing the CIA's response to Bonner's FOIA request and asserting why exemptions apply to certain withholdings, *see* Blaine Decl.; and (3) Michael G. Seidel, Section Chief of FBI's Record/Information Dissemination Section ("RISD"), detailing the FBI's response to Bonner's FOIA request and asserting why exemptions apply to certain withholdings, *see* Seidel Decl. The CIA filed an additional classified declaration, from Blaine, for the Court's *in camera*, *ex parte* review. *See* Dkt. 46 (notice of lodging of classified document).

On February 23, 2023, Bonner cross-moved, while stating that he no longer intended to challenge numerous redactions, "except to the extent [the redactions] may withhold previously disclosed information." Pl. Mem. at 23; *see* Dkts. 47, 49–50. In support Bonner filed several declarations. These are from: (1) Cathy Scott-Clark, an investigative journalist who has worked on the documentary project with Bonner, arguing why defendants' redactions are improper, including in light of official disclosures of the withheld material, *see* Scott-Clark Decl.; and (2) David A. Schulz, Bonner's counsel, detailing the procedural history of Bonner's FOIA requests, arguing that the CIA has made implausible claims of national security harm, and recounting the declassification of a portion of a book authored by Soufan, *see* Schulz Decl.

On May 19, 2023, defendants replied. *See* Dkts. 57 ("Defs. Reply"), 58–60. Defendants again supplied declarations in support from: (1) Blaine, *see* Dkt. 59 ("Blaine Supp. Decl."); (2) Normand, *see* Dkt. 58; and (3) Joseph E. Bender, Jr., Acting Section Chief of FBI's RISD, *see* Dkt. 60 ("Bender Decl."). Defendants also filed a supplemental classified declaration from Blaine. On June 20, 2023, Bonner replied. Dkt. 63 ("Pl. Reply").[3]

---

[3] On July 5, 2023, the Court, based on its review of these submissions, ordered the parties to file a joint letter, isolating the issues and documents remaining in dispute and attaching an index of

## II.     Applicable Legal Standards

### A.     Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008); *see also Celotex Corp. v. Catrett*, 477 US. 317, 323 (1986).

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). Rather, to survive a summary judgment motion, the opposing party

---

all disputed redactions, with each accompanied by text identifying the applicable exemption. Dkt. 64. On July 7, 2023, the parties filed a joint letter, in which the Government disclosed a "processing error" by the CIA. Dkt. 65. With respect to certain redactions claimed by the FBI, the letter explained, the CIA had failed to consider independently whether to assert privilege under FOIA Exemptions 1 and 3. *Id.* at 3. On July 10, 2023, the Court ordered the CIA to undertake an expedited review process, to be completed within four weeks; to propose an expedited briefing schedule with respect to any new claims of privilege by the CIA under Exemptions 1 and 3; and to provide the index the Court had requested in its July 5 order. Dkt. 66. On July 14, 2023, the CIA proposed a supplemental briefing schedule, Dkt. 67, and provided the index, *see* Dkt. 67-4 (index grouping redactions by exemptions). On July 17, 2023, the Court adopted the proposed schedule, while stating that it would continue working towards a decision resolving the cross-motions based on the disputed exemption claims that had already been briefed. Dkt. 68. This is that decision. To the extent that the CIA's expedited review makes additional claims of privilege, the Court will address these in a supplemental order. *See Am. C.L. Union v. Dep't of Def.*, 322 F. Supp. 3d 464, 481 (S.D.N.Y. 2018) (giving "the CIA a second chance" to provide a sufficient response to plaintiff's request consistent with the Court's ruling, in light of the national security interests at play).

must establish a genuine issue of fact by "citing to particular parts of materials in the record."
Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In
determining whether there are genuine issues of material fact, the Court is "required to resolve
all ambiguities and draw all permissible factual inferences in favor of the party against whom
summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal
quotation marks omitted) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

### B.   Summary Judgment Motions Under FOIA

FOIA governs public access to information held by the federal government. "The basic
purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic
society, needed to check against corruption and to hold the governors accountable to the
governed." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (citation omitted).
However, "Congress realized that legitimate governmental and private interests could be harmed
by release of certain types of information, and therefore provided the specific exemptions under
which disclosure could be refused." *Id.* (citation omitted). "Recognizing past abuses, Congress
sought to reach a workable balance between the right of the public to know and the need of the
Government to keep information in confidence to the extent necessary without permitting
indiscriminate secrecy." *Id.* (citation omitted).

"FOIA thus mandates that an agency disclose records on request, unless they fall within
one of nine exemptions." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). "These
exemptions are explicitly made exclusive, and must be narrowly construed." *Id.* (citations
omitted). "The agency asserting the exemption bears the burden of proof, and all doubts as to
the applicability of the exemption must be resolved in favor of disclosure." *Wilner v. Nat'l Sec.
Agency*, 592 F.3d 60, 69 (2d Cir. 2009). Courts review the adequacy of the agency's
justifications *de novo. Id.* Even if portions of a responsive record are properly exempt, the

8

agency must "take reasonable steps necessary to segregate and release nonexempt information."

5 U.S.C. § 552(a)(8)(A)(ii)(II); *see FBI v. Abramson*, 456 U.S. 615, 626 (1982).

Summary judgment is the usual means by which a court resolves a challenge to a

government agency's FOIA response. *See, e.g.*, *Johnson v. CIA*, No. 17 Civ. 1928 (CM), 2018

WL 833940, at \*2 (S.D.N.Y. Jan. 30, 2018); *Carney v. U.S. Dep't of Just.*, 19 F.3d 807, 812 (2d

Cir. 1994). "Summary judgment is warranted on the basis of agency affidavits when the

affidavits describe the justifications for nondisclosure with reasonably specific detail,

demonstrate that the information withheld logically falls within the claimed exemption, and are

not controverted by either contrary evidence in the record nor by evidence of agency bad faith."

*Wilner*, 592 F.3d at 73 (citation omitted). An agency's affidavits in support of its nondisclosure

are "accorded a presumption of good faith." *Carney*, 19 F.3d at 812 (internal quotation marks

and citation omitted). However, "conclusory affidavits that merely recite statutory standards, or

are overly vague or sweeping will not . . . carry the government's burden." *Larson v. Dep't of

State*, 565 F.3d 857, 864 (D.C. Cir. 2009). "Ultimately, an agency's justification for invoking a

FOIA exemption is sufficient if it appears logical or plausible." *Wilner*, 592 F.3d at 73 (citation

omitted).

Moreover, courts consistently adopt a "deferential posture in FOIA cases regarding the

uniquely executive purview of national security" and accord "substantial weight" to agencies'

declarations predicting harm to national security. *Id.* at 73, 76; *see also Halperin v. CIA*, 629

F.2d 144, 148 (D.C. Cir. 1980) (where agency affidavits appear sufficient, "the court is not to

conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would

violate the principle of affording substantial weight to the expert opinion of the agency").

### C.    *In Camera* Review

District courts may review documents containing challenged withholdings *in camera*.

5 U.S.C. § 552(a)(4)(B); *Tigue v. U.S. Dep't of Just.*, 312 F.3d 70, 82 (2d Cir. 2002).  Where

agency affidavits are "not sufficiently detailed to permit meaningful assessment of the exemption

claims," *in camera* review "may be appropriate when the number of records involved is

relatively small and when the dispute turns on the contents of the documents, and not the parties'

interpretations of the documents." *Am. C.L. Union v. Dep't of Just.*, No. 12 Civ. 7412 (WHP),

2014 WL 956303, at *3 (S.D.N.Y. Mar. 11, 2014) (internal quotation marks and citations

omitted).  "Affidavits or declarations . . . giving reasonably detailed explanations why any

withheld documents fall within an exemption are sufficient to sustain the agency's burden."

*Carney*, 19 F.3d at 812.  Declarations from government agencies are "accorded a presumption of

good faith." *Id.* (internal quotation marks and citation omitted).  However, such declarations

must be "relatively detailed and nonconclusory." *Grand Cent. P'ship, Inc. v. Cuomo*,

166 F.3d 473, 488–89 (2d Cir. 1999) (internal quotation marks omitted).

"*In camera* review is considered the exception, not the rule, and the propriety of such

review is a matter entrusted to the district court's discretion." *Int'l Bhd. of Elec. Workers v.*

*NLRB*, 845 F.2d 1177, 1180 (2d Cir. 1988).  "If an agency's statements supporting exemption

contain reasonable specificity of detail as to demonstrate that the withheld information logically

falls within the claimed exemption and evidence in the record does not suggest otherwise . . . [,]

the court should not conduct a more detailed inquiry to test the agency's judgment and expertise

or to evaluate whether the court agrees with the agency's opinions." *Wilner*, 592 F.3d at 76

(quoting *Larson*, 565 F.3d at 865) (cleaned up).

## III.    Discussion

The Court here resolves the parties' dispute as to the 1,586 redactions claimed by either the FBI or the CIA under FOIA Exemption 3.[4]

Under FOIA Exemption 3, an agency is permitted to withhold information that is "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). "Under that exemption, the [agencies] need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute." *Larson*, 565 F.3d at 864 (citing *Fitzgibbon v. CIA*, 911 F.2d 755, 761–62 (D.C. Cir. 1990)). Here, the agencies identify as the relevant withholding statute the statutory protection, under the National

---

[4] The Court relied on the parties' index in tabulating this figure. As to many of these redactions, the agencies also claim privilege from withholding under other exemptions, most predominantly, Exemption 1. *See* Dkt. 67 at 2 (noting that all redactions that are subject to an Exemption 1 claim are also the subject of an Exemption 3 claim; thus, there are no redactions subject only to Exemption 1); *Larson*, 565 F.3d at 863 ("FOIA Exemptions 1 and 3 are independent; agencies may invoke the exemptions independently and courts may uphold agency action under one exemption without considering the applicability of the other.").

Under FOIA Exemption 1, an agency may withhold records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1)(A), (B). The Executive order on which the agencies rely here is Executive Order 13,526, 75 Fed. Reg. 707 (Jan. 5, 2010) (the "E.O."). Under it, (1) an "original classification authority" must classify the information; (2) the information must be "owned by, produced by or for, or . . . under the control of the United States Government"; (3) the information must fall within one or more of the eight protected categories of information listed in section 1.4 of the E.O.; and (4) an original classification authority must "determine[] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and be "able to identify or describe the damage." E.O. 13526 § 1.1(a)(1)–(4). The agencies assert that the information at issue falls within section 1.4(c) of E.O. because it pertains to "intelligence activities (including covert action), [or] intelligence sources or methods." *See* Blaine Decl. ¶ 31(c); Seidel Decl. ¶¶ 28–30.

Although the agencies' claims under Exemption 1 appear substantial, the Court—in light of its determination that Exemption 3 separately covers the withheld information—need not resolve whether Exemption 1 also applies. The Court will resolve that question in the event that later developments in this litigation make doing so necessary.

Security Act (the "NSA"), of "intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1).

"Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage." *Goland v. C.I.A.*, 607 F.2d 339, 350 (D.C. Cir. 1978). The Court "must consider whether the withheld material satisfies the criteria of the exemption statute." *Wilner*, 592 F.3d at 72 (citations omitted). Insofar as the agencies rely on the NSA, the Court, in conducting this analysis, must determine whether the agencies have adequately demonstrated that the "release of the requested information can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods." *Phillippi v. C.I.A.*, 546 F.2d 1009, 1015 (D.C. Cir. 1976). In evaluating this question, the Court "accord[s] substantial weight and due consideration to the [agencies'] affidavits." *Fitzgibbon*, 911 F.2d at 762; *Church of Scientology of Cal., Inc. v. Turner*, 662 F.2d 784, 785 (D.C. Cir. 1980).

Bonner does not dispute that the NSA is an exemption statute. *See* Pl. Mem. at 6–7; *see also C.I.A. v. Sims*, 471 U.S. 159, 168 (1985). Instead, he attacks the agencies' withholdings in two respects. First, he argues that the redacted information does not reveal "intelligence sources and methods," as the NSA contemplates. *See* Pl. Reply. at 12–14. Second, he argues that even if Exemption 3 is properly invoked, the Government has waived its applicability here by officially acknowledging the information in public fora. *See* Pl. Reply at 2–8; *Fitzgibbon*, 911 F.2d at 765 ("[W]hen information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim."). The Court addresses each argument in turn.

### 1.      Do the Redactions Protect Information Reasonably Expected to Lead to Disclosure of "Intelligence Sources and Methods"?

The Second Circuit—in a case in which the contested records also concerned Zubaydah's interrogation—has held that the "plain meaning" of "intelligence sources and methods" means, in this context, that the information at issue falls "within the [agencies'] mandate to conduct foreign intelligence." *See Am. C.L. Union v. Dep't of Just.*, 681 F.3d 61, 73 (2d Cir. 2012) (rejecting proposed narrower definition, and holding that records relating to Zubaydah's interrogation, including his photograph and documents describing the use of waterboarding, fall within the scope of the NSA). That definition is broad. It requires a court to view, with some solicitude, agencies' reasoned explanations as to why information falls within the statute.

Here, the agencies attest that the redacted portions of the notebook and summaries contain information that would, if disclosed, reveal intelligence sources and methods. These portions, they attest, "consist of raw intelligence collected from . . . Zubaydah regarding his knowledge of the terrorist organization al Qaeda and its affiliates," and "contain numerous details about Zubaydah's knowledge of and interaction with al Qaeda members and other individuals associated with that group or other terrorist organizations over a years-long period." Blaine Decl. ¶ 32; *see* Defs. Mem. at 2. Some portions they seek to withhold would "reveal the location of CIA detention facilities overseas." Defs. Mem. at 2. Others would reveal "certain names and other identifying details, dates, locations, details about meetings and operations, and operational and security techniques employed by terrorist entities." Blaine Decl. ¶ 27. Others concern "locations at which Zubaydah was held and treated after he was detained," or "related information, such as time and dates, [which] could, in combination with other information, be revealing of detention locations." Defs. Mem. at 10 n.6. Exemption 3 also applies here, the agencies assert, to "protect unclassified intelligence sources and methods that were employed as

law enforcement techniques or procedures." *Id.* at 15; *see Sims*, 471 U.S. at 176 (NSA protects intelligence sources and methods from unauthorized disclosure, regardless of whether these are classified).

The Court has carefully reviewed the CIA's classified declarations on these points.[5] These declarations develop the above points in far greater detail. In numerous instances, these identify the exact information redacted. And they concretely and coherently explain why such information would reveal, or would reasonably be expected to reveal, intelligence sources and methods. In the Court's experience, these classified declarations reflect an unusual and commendable degree of care in the Government's approach to classification and redactions. They reflect, as well, that the redactions to the materials in this case were made judiciously, not excessively, and based on a sophisticated and informed understanding of the ongoing national security threats posed by al Qaeda and its affiliates. The classified declarations, in sum, do far more than simply state "*ipse dixit.*" *Am. C.L. Union v. Dep't of Def.*, 492 F. Supp. 3d 250, 262 (S.D.N.Y. 2020); *see Bonner v. CIA*, No. 19 Civ. 9762 (JMF), 2021 WL 3193090, at *4 (S.D.N.Y. July 28, 2021) (court's conclusion that Bonner failed to show that specific information was officially disclosed was "bolstered by the Court's *in camera* review of the CIA's classified declaration, which contain[ed] more detailed information about the substance of the classified

---

[5] Bonner challenges the Government's reliance on classified declarations, on the ground that the "facts and explanations" the Government offers should be "on the public record to the greatest extent possible." Pl. Reply at 14 (citing cases). But the case law does not bar the Government from utilizing *ex parte* submissions where the information given to the Court, if publicly revealed, would reveal the very information that Exemption 3 protects. For that reason, the use of *ex parte* submissions in FOIA cases implicating national security is commonplace, *see, e.g., Open Soc'y Just. Initiative v. CIA*, 505 F. Supp. 3d 234, 240 (S.D.N.Y. 2020); *Am. C.L. Union*, 681 F.3d at 61, 70, 76, and assists courts' understanding by enabling agencies to freely and with specificity develop the bases for contested withholdings. The classified declarations, the Court finds, are proper in their entirety.

information" at issue (internal quotation marks omitted)), *appeal dismissed sub nom. Bonner v. Cent. Intel. Agency*, No. 21-2181, 2021 WL 7449786 (2d Cir. Dec. 14, 2021). They have meaningfully "educate[d] the Court." *Open Soc'y Just. Initiative v. Dep't of Def.*, No. 20 Civ. 5096 (JMF), 2021 WL 3038528, at *7 (S.D.N.Y. July 15, 2021) (internal quotation marks). Viewing the classified and non-classified declarations in combination, they give the Court sufficient information to evaluate whether the contested redactions are "logical and plausible." *Florez v. CIA*, 829 F.3d 178, 185 (2d Cir. 2016).

"Accord[ing] substantial weight and due consideration to the [agencies'] affidavits," *Fitzgibbon*, 911 F.2d at 762, the Court finds that the FBI and CIA have set forth a sufficiently detailed and supported account of why the redactions protect information reasonably expected to lead to the disclosure of intelligence sources and methods. The unclassified declarations here accord with those held by other courts to adequately support that the redacted information falls within the NSA's reach. *See, e.g., Wilner*, 592 F.3d at 73 (analyzing sufficiency of agency's invocation of Exemption 3 with affidavits, and finding agency proffers to "sufficiently establish that nondisclosure is appropriate—perhaps essential—for reasons of national security and confidentiality," even where affidavits are limited because they "cannot provide any more information without doing cognizable harm"); *Larson*, 565 F.3d at 865 (acknowledging that "Congress gave the [CIA] broad power to control the disclosure of intelligence sources" and therefore concluding that the CIA's affidavits, which confirmed that the withheld documents related to intelligence sources and methods, were sufficient to entitle the CIA to withhold the records pursuant to Exemption 3) (internal quotation marks omitted)); *see also Sims*, 471 U.S. at 179 (because intelligence officials must "be familiar with 'the whole picture' as judges are not,"

their judgments "are worthy of great deference given the magnitude of the national security interests and potential risks at stake").

Moreover, although agencies, under Exemption 3, "need not make a specific showing of potential harm to national security in order to justify withholding information under [the NSA] because 'Congress has already, in enacting the statute, decided that disclosure of [agency] activities is potentially harmful,'" *Elec. Priv. Info. Ctr. v. Nat'l Sec. Agency*, 678 F.3d 926, 931 (D.C. Cir. 2012) (quoting *Hayden v. NSA*, 608 F.2d 1381, 1390 (D.C. Cir. 1979)), the agencies here have done so. *See* 5 U.S.C. § 552(a)(8)(A)(i) (agency carries burden to show that disclosure would foreseeably cause the type of harm the exemption is intended to prevent, unless disclosure is otherwise prohibited by law). In its unclassified declaration, the CIA attests that release of the redacted information "is reasonably likely to significantly impair the CIA's ability to carry out its core missions of gathering and analyzing intelligence" by "alert[ing] al Qaeda and its associates to specific information Zubaydah disclosed to the U.S. government, as well as information he did not," creating opportunities for foreign adversaries "to leverage potential gaps in intelligence" and "countermeasures." Blaine Decl. ¶ 32. The FBI similarly attests to the harm that release of the redacted information would cause by "identify[ing] targets of foreign counterintelligence investigations" and "disclos[ing] the capabilities of the activities and methods directed at specific targets." Seidel Decl. ¶¶ 30–31. The agencies' classified declarations substantially develop these concerns of damage to national security, with notable specificity. *See Am. C.L. Union*, 681 F.3d at 70 ("We have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." (internal quotation omitted) (cleaned up)).

16

For these reasons, the Court finds that the Government has justifiably claimed privilege on the ground that the information withheld would reasonably be expected to disclose, or lead to the disclosure of, intelligence sources and methods.

### 2. Have the Agencies Waived Exemption 3's Applicability Through Official Disclosure?

Bonner argues that, even if the agencies otherwise could have properly invoked Exemption 3, they have foregone the right do so here by officially acknowledging the information they seek to withhold. He points to several sources in which, he contends, the agencies have officially acknowledged in the public domain the information he believes they have redacted.

"[W]hen information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim." *Fitzgibbon*, 911 F.2d at 765. However, a finding that an agency has officially acknowledged information must be based on a disclosure by the agency—it cannot be based on public commentary or speculation about that information, no matter how widespread. *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983) (rejecting claim that public speculation about CIA liaison with Iranian government constituted prior disclosure). Rather, under what the Second Circuit has characterized as its "precise and strict test," *N.Y. Times v. Cent. Intel. Agency*, 965 F.3d 109, 116 (2d Cir. 2020), an official acknowledgment must "(1) [be] as specific as the information previously released, (2) match the information previously disclosed, and (3) . . . [be] made public through an official and documented disclosure," *Wilson*, 586 F.3d at 186 (quotation marks omitted; alteration in original). *See Osen LLC v. U.S. Cent. Command*, 969 F.3d 102, 110 (2d Cir. 2020) (reaffirming *Wilson* test); *see also Pub. Citizen v. Dep't of State*, 11 F.3d 198, 202 (D.C. Cir. 1993); *Afshar*, 702 F.2d at 1133. "[A]n official acknowledgement does not compel the disclosure of other

classified information where the prior disclosure is only similar to, or partially overlaps with, the withheld information." *Am. C.L. Union v. Dep't of Def.*, 435 F. Supp. 3d 539, 556 (S.D.N.Y. 2020). And "whether information is or is not properly classified plays no independent role in the official disclosure doctrine analysis." *Bonner*, 2021 WL 3193090, at *2 (internal quotation marks omitted).

In applying the first two elements of the *Wilson* test, "there is no exhaustive list of factors a court must consider." *Osen*, 969 F.3d at 110. "[A]t times these prongs blend together, likely because it is rare to encounter a scenario in which the result is different under each." *Id.* "[S]pecificity concerns the quality or kind of information about a particular topic that has been produced to the public." *Id.* "Generally, for information to be 'as specific as' that which was previously disclosed, there cannot be any substantive differences between the content of the publicly released government documents and the withheld information." *Id.* (quoting *Am. C.L. Union v. U.S. Dep't of Def.*, 628 F.3d 612, 620–21 (D.C. Cir. 2011) (cleaned up)). "[E]ven a 'substantial overlap' between the requested information and previously disclosed information is not enough to establish waiver. Rather, there must be enough of an overlap in subject matter between disclosed and withheld records to fairly say that the two records 'match'—in other words, that they present the same information about the same subject." *Id.* at 112 (quoting *N.Y. Times*, 965 F.3d at 116, 119). "Matching, by comparison to specificity, is therefore a question of what topics have already been produced to the public." *Id.*

As to the third element of the *Wilson* test, the Second Circuit has instructed that "courts will 'not infer official disclosure of information classified by [an agency] from (1) widespread public discussion of a classified matter, (2) statements made by a person not authorized to speak for the [a]gency, or (3) release of information by another agency, or even by Congress.'" *N.Y.*

*Times*, 965 F.3d at 116 (quoting *Wilson*, 586 F.3d at 186–87). "[J]ust because the existence of classified activity may be inferred from publicly available information or from official statements, government waiver will not be found unless all legal criteria have been met." *Id.*; *accord Osen*, 969 F.3d at 109.

After reviewing the disputed redactions and the parties' submissions addressing them, both unclassified and classified, the Court rejects Bonner's claim of an official acknowledgment of the withheld information. The Government has not withheld information that is as specific as, or that matches, information made public through an official, documented disclosure. The Court so holds while recognizing the impressiveness of Bonner's attempt to show an official disclosure. Scott-Clark's declaration in particular comprehensively reviews the redactions claimed by the agencies and reflects a deep understanding of the underlying subject matter. Her survey painstakingly groups redactions into common categories; opines as to the information that she believes is behind various redactions; addresses the redactions singularly and collectively; and ultimately seeks to explain why the information at hand is in the public domain.

The Court reviewed each of Bonner's objections to the redactions, including to redactions Bonner asserts relate to Zubaydah's: childhood, *see* Scott-Clark Decl. ¶ 32; nickname "Hani," *see id.* ¶ 33; travel to Pakistan and time at Khaldan training camp in Afghanistan, *see id.* ¶¶ 34, 41–42; alias "Abu Hurayrah," *see id.* ¶ 35; jihad-fighting career, battle injury, and impact of that injury, *see id.* ¶¶ 36–37, 39; activities securing passports, *see id.* ¶ 40; meeting with Osama bin Laden ("bin Laden") regarding the Khaldan training camp, *see id.* ¶ 44; move to Iran and plastic surgery, *see id.* ¶ 45; motive for attacks in Israel, *see id.* ¶¶ 46–47; travel towards Pakistan from Afghanistan, *see id.* ¶ 50; capture, transport to Thailand, and medical condition and care, *see id.* ¶¶ 52–53, 55–56; interrogation by United States agents, *see id.* ¶¶ 54, 57–58, 64–68, 70, 118–22;

animosity towards Israel and the Mossad, *see id.* ¶ 59; relationship and conversations with bin Laden, *see id.* ¶¶ 84–86, and information about Ramzi bin al-Shibh and the USS Cole plot, *see id.* ¶¶ 112–14. The Court has also reviewed Bonner's objections relating to redactions that Scott-Clark contends disclose: bin Laden's use of Zubaydah's savings to finance the September 11, 2001 attacks, *see id.* ¶¶ 48–49; Soufan's objections to the torture methods of CIA contractor James Mitchell, *see id.* ¶¶ 62–63; Khalid Sheikh Mohammed's aliases and roles, *see id.* ¶¶ 74–77; a plot to attack the World Trade Center with Cessna airplanes, *see id.* ¶ 79; Ramzi Yousef, *see id.* ¶ 81; Zacarias Moussaoui, *see id.* ¶ 88; Abu Hafs al-Masri, *see id.* ¶¶ 89–91; Al-Tayyab Agha, *see id.* ¶¶ 92, 95; José Padilla, Binyam Mohamed, and a dirty bomb plot, *see id.* ¶ 98; Richard Reid, Sajid Badat, and a shoe bomb plot, *see id.* ¶ 105; and Abd al-Rahim al-Nashiri, *see id.* ¶¶ 110–11.

Insofar as *Wilson*'s third element requires "official and documented disclosures," Scott-Clark points largely to books by former CIA and FBI officials, including Gaudin and Soufan, and by subject-matter experts, including Scott-Clark herself. *See* Cathy Scott-Clark & Adrian Levy, *The Forever Prisoner: The Full and Searing Account of the CIA's Most Controversial Program* (2022); Ali Soufan, *The Black Banners (Declassified): How Torture Derailed the War on Terror After 9/11* (2020); George Tenet, *At the Center of the Storm: My Years at the CIA* (2007); John Rizzo, *Company Man: Thirty Years of Controversy and Crisis in the CIA* (2014); James Mitchell, *Enhanced Interrogation: Inside the Minds and Motives of the Islamic Terrorists Trying to Destroy America* (2016); Jose Rodriguez, *Hard Measures: How Aggressive CIA Actions After 9/11 Saved American Lives* (2012). These books undoubtedly offer the public insights into subjects including the ones at issue. However, these sources do not qualify, under *Wilson* and other relevant caselaw, as "official and documented disclosure[s]." None, even those

authored by former employees such as Soufan, was issued by either agency.  And contrary to Bonner's argument, an agency's prepublication review, and publication approval, of a former employee's book does not constitute official disclosure by that agency.  *See Afshar*, 702 F.2d at 1133–34.  Accordingly, the content of these books cannot satisfy *Wilson*'s third prong.  Where Bonner's objections are made based on the content of these books, such as those relating to Zubaydah's childhood, nickname, alias, move to Iran, injury and recovery, travel towards Pakistan and Afghanistan, activities securing passports, capture and transport to Thailand, and bin Laden's use of Zubaydah's savings to finance the September 11, 2001 attacks, the objections fail for want of a public "official and documented disclosure."[6]

For other objections, Scott-Clark identifies additional sources that she contends bespeak an agency's official disclosure of the information that she concludes has been redacted.  These include declassified CIA cables; transcripts of detention hearings before the Guantanamo Periodic Review Board and the Combatant Status Review Tribunal; press releases, publications, and websites of various U.S. government components, including the Office of the Director of

---

[6] Soufan's book was first published in 2011, and was republished in longer form in 2020 after the CIA agreed to declassify portions of the book that, during prepublication review, had originally been deemed classified.  Drawing inferences about the redactions within Soufan's interrogation notes, Bonner contends that "[t]he declassified information in the book provides Agent Soufan's description of the same interrogation he contemporaneously described in the interrogation notes at issue."  Pl. Mem. at 15.  Bonner argues that Soufan's book drawing upon such materials therefore amounts to an official disclosure of items redacted here.  However, that argument does not carry the day as to *Wilson*'s third prong, because, with respect to his book, Soufan is the speaker, not the CIA or FBI.  *See Wilson*, 586 F.3d at 189 (former agency employee could not "effect an official disclosure of information").  To the extent Bonner argues that the declassification of information that Soufan drew upon for his book bears on whether the information withheld here was properly withheld under Exemption 3 as tending to reveal intelligence sources and methods, the Court's determination, based on the agencies' declarations, is that the materials redacted here do qualify for withholding under that standard.  *See also* Blaine Decl. ¶ 16 (noting that information that has been "unclassified or publicly known in one context" is not necessarily unclassified "in other contexts").

National Intelligence, the Department of State, the Department of Defense, and the FBI; a press

interview with an FBI official; a 2009 FBI Office of Inspector General report on the FBI's

involvement in and observations of detainee interrogations in Guantanamo Bay, Afghanistan,

and Iraq; the deposition testimony of Mitchell in a case in the Eastern District of Washington; the

2004 9/11 Commission Report; and the 2014 Senate Select Committee on Intelligence report on

the CIA's detention and interrogation program.

There is not on-point Second Circuit authority applying the official disclosure doctrine to

some of these sources. At least as to some, it is doubtful that the doctrine applies: The Circuit

has stated that "the CIA director personally reading relevant information into the *Congressional*

*Record*" qualifies as an official disclosure, *Wilson*, 586 F.3d at 195, while stating that "anything

short of such a disclosure necessarily preserves some increment of doubt regarding the reliability

of the publicly available information," *id.* And to the extent that these sources are entities other

than the agencies claiming redactions here, the Circuit has cautioned that courts should "not

infer" official disclosure from "release of information by another agency, or even by Congress."

*N.Y. Times*, 965 F.3d at 116 (quoting *Wilson*, 586 F.3d at 186–87). But even assuming *arguendo*

that each of Bonner's sources cleared that bar, the redactions implicated by the cited sources

have not been shown to meet *Wilson*'s first and second elements. On this point, the agencies'

unclassified declarations, and the CIA's classified declaration, are influential. They precisely

respond to Clark-Scott's applications of the official acknowledgement doctrine. On review of

the available evidence, the Court cannot find that the information withheld is as specific, or

matches, the information presently available to the public *via official disclosure*.

Finally, although not necessary to this decision, the Court notes that, as the unclassified

declarations explain, where the agencies *did* find Scott-Clark's arguments to establish an official

disclosure, they eliminated redactions and reproduced the documents to Bonner. *See* Blaine Supp. Decl. ¶¶ 10–11 (after review of Scott-Clark's declaration, identifying additional non-exempt information that could be released); Bender Decl. ¶ 10 (same).  To the extent that Bonner faults the agencies for initially withholding such information, this Court will not "hold against [the agencies] the fact that [they] revisited records [they] had already reviewed and reconsidered earlier exemption determinations in the face of continued challenges from" the applicant. *Bonner*, 2021 WL 3193090, at *7 (internal quotation marks omitted) (quoting *NRDC v. U.S. Env't Prot. Agency*, No. 17 Civ. 5928 (JMF), 2020 WL 6891537, at *4 (S.D.N.Y. Nov. 24, 2020)).  On the contrary, such thoughtful reconsideration, and an iterative review, is "the way the FOIA process should work"—and "a contrary holding would disincentivize reconsiderations by agencies, thereby undermining the ultimate goal of promoting the disclosure of records where an exemption does not apply." *Id.*  There is no basis here for finding that the agencies have acted in bad faith in this litigation. *See id* at *7 ("[I]t is well established that 'speculative assertions are insufficient to rebut the presumption [of good faith] accorded to agency affidavits.'" (quoting *Reynolds v. United States*, 350 F. App'x 474, 475 (2d Cir. 2009) (summary order) (second alteration in original))); *see id.* (denying *in camera* review for privileged information where Bonner made no showing of agency bad faith).

On its careful review of the agencies' classified and unclassified filings, the Court finds that the agencies have appropriately applied the *Wilson* standard here.  The redacted information is, therefore, properly protected from disclosure under FOIA Exemption 3.

## CONCLUSION

For the foregoing reasons, the Court (1) grants the Government's motion for summary judgment and (2) denies Bonner's cross-motion for summary judgment. The Clerk of Court is respectfully requested to terminate the motions pending at dockets 41 and 47.

As explained above, the Court on July 10, 2023 gave the CIA four weeks to identify additional claims of privilege, under Exemptions 1 and 3, that it asserts, within the scope of the materials that the FBI designated as exempt. *See supra* note 3. The parties are scheduled soon to submit briefs on those new claims of privilege, as well as a new joint index identifying the redactions, if any, that remain at issue after this decision. The Court will assess the CIA's new claims once fully briefed and issue a supplemental order resolving, to the extent necessary, those claims.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: August 9, 2023
New York, New York

24